# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| David Patrick Ditto,<br><br>                      Petitioner,<br><br>v.<br><br>Jeffrey Beard, Ph.D.,<br><br>                      Respondent. | Case No.: 15cv2756 JAH (PCL)<br><br>**REPORT AND RECOMMENDATION DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

## I. **INTRODUCTION**

A San Diego jury convicted Petitioner David Patrick Ditto of first-degree murder for killing his wife in 2012, for which he was sentenced to twenty-five years to life in prison. Petitioner's conviction was affirmed on appeal. Petitioner filed an original petition for writ of habeas corpus in the California Supreme Court on April 2, 2015, raising six claims of ineffective assistance of counsel. (Lodgment 3.) While that state petition was pending, Petitioner filed the instant petition in this Court on December 7, 2015, raising two claims. (Doc. 1.) Ground One, a claim of denial of the right to present a defense, has been raised and denied in the state court on direct appeal. (Lodgment 1.) Ground Two is a claim of ineffective assistance of counsel with six separate sub-claims. These sub-claims were contained in the then-pending California Supreme Court habeas petition. (Lodgment 3.) At Petitioner's request, this Court stayed and abeyed this federal

action until the state court ruled on the unexhausted claims. (Doc. 7.)

The California Supreme Court issued a general denial on the merits of the state petition on July 13, 2016. (Lodgment 4.) Petitioner then filed a Motion to amend his Petition on March 18, 2017 to add five new claims that have not been exhausted. (Doc. 24.) The Court denied Petitioner's motion because the claims were unexhausted. (Doc. 36.) Respondent filed an Answer to the original Petition on April 14, 2017. (Doc. 32.) After numerous extensions of time, Petitioner filed a traverse on September 18, 2017. (Doc. 46.) For the reasons discussed below, the Court **RECOMMENDS** the Petition be **DENIED**.

## II. FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1) (West 2006); *see also Parle v. Fraley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness). The state appellate court recounted the facts as follows:

Prosecution Case

Raymond McQueen, a firefighter and paramedic, testified that on March 12, 2011, he and a team of paramedics and firefighters responded to a call at 12:35 a.m., and arrived at the Ditto residence at 12:40 a.m. McQueen saw one of Ditto's arms covered in blood. Karina was covered in blood and lying on the floor. McQueen testified Karina felt cold to the touch: "With falls or even patients who we normally get in CPR status, there's blood flowing throughout your body, which keeps you at a normal temperature . . . depending on each patient. You can feel that temperature with the back of your hand even through the vinyl gloves we wear. Upon my initial assessment, right when we walked in, the skin signs is one of the main things – one of the first things that we check for, one of the first vital signs that we can assess. And I noticed that [Karina] was a little bit colder than what I would have expected." The prosecutor asked McQueen, "[W]as it unusual, in your experience, to have someone that you were called for an injury and to have them be hypothermic at their core within a half an hour?" McQueen answered in the affirmative, and agreed with the prosecutor that a person's body temperature generally takes "some time" to drop.

A recording device attached to a cardiac monitor captured the conversation among the first responders as they treated Karina. The jury heard the recording, in which Ditto was asked, "How long has she been down?" Ditto replied, "Two minutes." Asked if he had heard Karina fall, Ditto replied, "She was here. And I came to her. And she wasn't moving. And I was talking to her, talking to her, and then, and then she, she came to, and she started moving around so, I (unintelligible) and then she started, she started, she stopped. And I was trying to get her to come to and she wouldn't. She – she stopped. And so I started doing CPR and then realized – then I realized I should call 911. So I called 911. And then she came back and then . . . ." Fire Captain Steven Bixler asked Ditto, "Was she talking to you?" Ditto replied that Karina was "like mumbling."

McQueen testified, "Just by looking at [Karina] I could tell it was going to be more than a fall . . . it looked like we were going to be dealing with a CPR." McQueen continued, "[N]ormally, with falls – or at least in my experiences with the falls I've seen, the patient is usually alert and talking to us. If they're not, they may be in an altered state where they're a little bit confused, but this is the first time I've seen a fall that resulted directly in a patient going into CPR status." McQueen noted, "I've never seen a fall that resulted directly in asystole. Based on that cardiac rhythm, that's a completely dead heart. Especially with the lack of respirations, the patient is completely dead. We don't even see that on [victims of] car accidents. For me personally that raised a red flag with a fall from a stairs, without [the victim having] any prior heart history or prior medical problems."

McQueen conducted a rapid trauma assessment of Karina. He testified this case was unusual in that, "there was just blood everywhere. There was no active bleeding that we saw, but there was a lot of blood. We couldn't tell where it was coming from, even on the rapid exam." Another paramedic, Timothy Olson, examined Karina and concluded based in part on her eyes, which were fixed and dilated, that she had lost oxygen to the head for longer than six minutes. The prosecutor asked Olson, "The time frame that you were given by Mr. Ditto, did that coincide with the . . . different factors that you noted, being fixed pupils, the dried blood, lack of active bleeding and the coagulation of the blood?" Olson answered in the negative, explaining: "Based on the fact that she have asystole and the fixed and dilated pupils, for a heart to go into a lethal rhythm, you're looking at six to seven minutes before you start developing brain damage. As those pupils were dilated and she was already in asystole, where the heart was in a nonviable rhythm, there was nothing – we couldn't even electrically change her heart rate. We had to mechanically pump her chest and give her a medication that would increase her electrical ability of the heart. So you're looking at six to seven minutes

just for the brain and the body to start going hypoxic."

Captain Bixler started to do compressions on Karina shortly upon their arrival at the residence. Additionally, paramedics gave Karina medication intravenously and supplied her with oxygen. After approximately nine minutes, and just as paramedics were about to declare Karina legally and clinically dead, her heart resumed beating, but not "to the point where it was producing a pulse with perfusion of blood." Paramedics removed Karina from the floor and put her in an ambulance. McQueen observed that the blood underneath her body had formed "like a wavy pattern." McQueen testified, "From my experience, in terms of what we've seen, it would – with the swish marks, the way the blood was, it indicated movement." Paramedics took Karina to the hospital. McQueen stated, "From the time that we were on the scene to the time we offloaded at the hospital, [Karina] never maintained respirations or restored any of her own respirations. That was unusual."

McQueen saw no indications Ditto had performed CPR on Karina. Specifically, although all of the first responders who had performed CPR on Karina had gotten both of their hands bloodied from the amount of blood on Karina's shirt, only one of Ditto's hands were bloodied; Karina's clothing did not appear to have been moved from her having received CPR; and Ditto appeared calm and not out of breath from having exerted energy performing CPR.

Lisa Marie Challender, a firefighter and paramedic, was asked at trial if there any discrepancies between what she had seen when examining Karina at the residence and what Ditto had reported to paramedics. Challender responded in the affirmative. Challender disagreed with Ditto's statement that Karina had been down for two minutes, noting: "The blood was drier than I would have assumed at two minutes. She was cooler in temperature than I would have assumed for somebody that had had a pulse two minutes before that. The asystole was really concerning and the fact that it took us so many minutes to get [her pulse] back. A young heart can usually come back quicker. So that meant, to me, there was more of a downtime." Challender clarified that the term downtime "just means a long time without oxygen."

Challender questioned Ditto's account of the fall: "Generally, when people fall, they have unilateral, which means one side – one side injuries, if they fall to the ground. [Karina] had bilateral injuries, but she also had injuries anterior and posterior. And so for somebody to have . . . fallen onto the tile surface, how come she was injured on both sides of her face and then the back of her head also? That – that didn't make sense to me." In the ambulance, Challender had detected the

sweet odor coming from Karina. After talking to a trauma surgeon, Challender realized the odor was lactic acidosis, indicating that Karina's body had been deprived of oxygen "for a while."

Captain Bixler stayed at the house and interviewed Ditto, who had fresh scratches on his face and neck, and blood on his arm. Ditto stated the scratches and blood on his body must have resulted from his doing CPR on Karina. Captain Bixler pondered "what actually happened," reasoning that someone receiving CPR lacks a pulse and is "unable to fight back." The first responders became "suspicious" because Ditto's account of the incident was "not adding up;" therefore, they called police.

San Diego Police Officer Ivan Sablan interviewed Ditto at the crime scene that morning. Officer Sablan testified: "To see the scratches [on Ditto] and to see the condition of Mrs. Ditto, it just kind of – I just didn't feel right about the whole thing, but I didn't really know how much I had there. So I let [another police officer], who also was responding to the scene – just kind of let him know what I had seen. And so he had kind of felt the same way about the whole situation. So he called the domestic violence on-call sergeant, just to see – you know, let him know what we had at the time." Officer Sablan examined the stairway but did not see any pictures or other objects out of place. Moreover, he did not notice any blood on the carpeting or on the walls, or scuff marks or dents on the walls. At around 3:40 a.m. that day, a detective expert regarding domestic violence arrived at the Ditto residence to investigate further.

Dr. Yoo examined Karina at the hospital and stated that the CT scan showed that all parts of her brain were swollen. Karina also had signs of external head injury, including a very large scalp hematoma, and a laceration to the back of her head. Dr. Yoo considered it unlikely that Karina's external injuries related to her internal injuries, explaining: "The scalp hematoma was just in the right frontal area. And it is difficult to get global, total brain edema with just a one-sided – or one part of the head being hurt that way. So it just wasn't a consistent picture." Dr. Yoo consulted with Dr. Imad Dandan, a trauma surgeon, and they both believed "the scalp hematoma or the laceration to the back of [Karina's] head just didn't explain, again, the global diffuse cerebral edema. [They] felt it was most likely something else that happened after she fell and hit her head that led her to have oxygen deprivation of the brain that gave her the diffuse cerebral edema." Dr. Yoo testified he had diagnosed Karina as clinically brain dead, and having suffered anoxic injury to the brain, meaning a loss of blood flow and oxygen to the brain. Dr. Yoo noted, "If this anoxic brain injury is just what we suspect, then there was some – some event that caused [Karina] to lose the ability to breathe and get oxygen to the brain.

So our suspicion is it occurred in a very rapid fashion at the time of the trauma that took place. To Dr. Yoo, Karina's injuries were consistent with strangulation. Dr. Dandan treated Karina within 20 minutes of her arrival at the hospital. Her toxicology test showed she had no alcohol or drugs in her system. She had "normal vital signs with good pulses," but she had significant acidosis, which is produced when the body lacks sufficient oxygen circulating through the tissues. Based on the CT scan, Dr. Dandan concluded, "We did not find any injury to the brain itself, but there was significant amount of swelling to the brain, which was consistent with the lack of oxygen to the brain for a relatively prolonged time." He further concluded, "There was no primary brain injury or primary cervical spine injury that led to [Karina's] cardiac arrest." Karina had a fracture on the first rib, which would have required "quite a bit of force" to fracture. Dr. Dandan testified: "Usually we see that [kind of injury] with falls from extreme heights or major car accidents." Dr. Dandan testified Karina's brain injuries could have been caused by strangulation. On cross-examination, Dr. Dandan agreed that a fall could have caused the laceration found on the back of Karina's head. Asked whether a fall could have caused Karina's heart rhythm malfunction, Dr. Dandan replied in the negative: "Diffuse axonal injury does not cause that kind of heart effect. The kind of trauma to the brain that causes the heart to stop has to be what we call a mass lesion, something that is pushing on the brain from one side to the other, causing a midline shift, kinking the brain stem, thus stopping the breathing, thus stopping the heart." Dr. Dandan explained that "diffuse axonal injury . . . causes separation between what's known as the gray matter and the white matter. So although the neurons are still functional and alive, the communication between the parts of the brain is not there anymore." Over a period extending beyond four or five days, that injury could cause death.

Cardiologist Craig Sclar examined Karina in the hospital and concluded based on tests administered to her that she had a normal heart and no cardiac pathology; therefore, a heart attack did not cause her heart to stop beating. Dr. Sclar was asked on redirect examination: "The condition that you saw Ms. Karina Ditto in when you treated her, was she in a condition consistent with a fall down the stairs?" He replied that after examining Karina, he had asked himself, "How does falling down the stairs cause you to come in essentially brain dead? I just – personally, I didn't understand that."

Nurse Stephanie Hanifan worked in the hospital's surgical intensive care unit and testified that on March 14, 2011, she conducted a head-to-toe assessment of Karina; "[Karina] had a lot of bruising. I wasn't really expecting that. And so I – she had a lot of bruising over her body. It was almost hard to document all of it because there was just – it was pretty extensive." Specifically, Karina had bruises

on her forehead, eye, lip, mouth, face, clavicle, chest, right arm, hands, right leg and upper thigh, shin and ankle, and right back shoulder. She also had a chin wound and a laceration on the back of her head. Nurse Hanifan testified she had difficulty opening Karina's swollen eyes in order to check her pupils. Nurse Hanifan added, "I didn't think that [Karina's] bruising and just the injuries matched to [sic] the report that I got. And, to me, it looked like she had been beaten." Nurse Hanifan observed scratches on Ditto's face and neck but noted that later that day Ditto had buttoned his shirt completely, thus covering the scratches on his neck. Nurse Hanifan testified, "I thought maybe – I thought he was trying to cover the scratches on his neck."

Dr. Othon Mena performed an autopsy on Karina and concluded she had died from "post-arrest hypoxic ischemic encephalopathy due to asphyxia with neck compression and blunt trauma." He further concluded the manner of death was homicide. Dr. Mena explained: "The injuries that are consistent with strangulation are the hemorrhages of the neck near the thyroid gland, the ones in the back of the neck. And then also the – all those petechial hemorrhages around the eyes and the eyelids." Dr. Mena pointed out that the blunt force injuries to Karina's head and body were survivable; therefore, her strangulation made the difference in causing her death. He stated that generally someone can suffer permanent brain damage from being strangled for approximately three to five minutes. Dr. Mena concluded that Karina had suffered some defensive injuries on her arms, shins, thigh, back and face. In reaching that conclusion, he took into account the scratches observed on Ditto's face and neck. Dr. Mena was aware from Karina's medical files that at the hospital Karina's subclavian vein had been punctured, causing bleeding. However, he concluded that injury had not caused her death.

The People also presented evidence indicating Ditto's possible motive for killing Karina: Having had marital problems in the past, they had considered divorce; Ditto was jealous, and knew that in the months before her death, one of Karina's male coworkers had commented favorably on a photograph she had posted on a social website; the coworker had sent Karina a nude photograph of a male, and Karina had sent that coworker a picture of herself in which she appeared partially undressed; Ditto had recently bought an insurance policy covering accidental death and dismemberment for himself and his family. Karina was insured for $150,000.

Defense Case

Ditto testified regarding the events leading to Karina's injuries. Specifically, he and Karina had been watching television, and she went to an upstairs bathroom. Ditto heard her fall down the stairs. She was not moving or breathing; therefore, he

performed CPR on her. She responded by moving her arms and head, and grabbed her head, moving it from side to side. She grabbed at Ditto, tried to speak, but made no sound. She soon stopped moving. Ditto called 911 and returned to try to wake up Karina, but he was unable to do so. Paramedics arrived shortly afterwards. On direct examination, Ditto denied he did the following to Karina: "kick[ed] her in the forehead so hard that it caused a huge bruise that caused swelling to her forehead;" or "stomp[ed] on her leg so hard that it left a pattern bruise that showed up three days later"; or "wrap[ped] [his] hands around her throat and squeeze for five minutes, until the life drained out of her."

Defense expert pathologist Dr. Michael Baden reviewed Karina's hospital records and the autopsy conducted by Dr. Mena. Dr. Baden found "no evidence [Karina] died of strangulation." Instead, Dr. Baden concluded Karina "died of traumatic brain injury consistent with the fall that was described by [Ditto], but she died of brain damage." In ruling out strangulation, Dr. Baden reviewed reports that Karina had hemorrhaged in the vicinity of her right collar bone. Dr. Baden asserted he "look[ed] at the possibility of compression of the neck. But as shown in some of the photographs that Dr. Mena took, the hemorrhage is in the wrong place for strangulation and it's too much for strangulation, and it's consistent with hemorrhage from mistaken puncture of the subclavian artery by one of the residents." Dr. Baden elaborated on cross examination: "I take everything into consideration, that there was no marks on the neck of strangulation, that – you know, from the skin, that there were no injuries to the hyoid bone or thyroid cartilage and that the blood around the trachea and thyroid gland comes from the subclavian artery puncture and not from neck compression. So I saw no evidence for strangulation, manual strangulation."

(Lodgment 1, at 2-12.)

## III. **DISCUSSION**

Petitioner raises two grounds in his petition. In ground one, Petitioner argues that the exclusion of medical evidence violated his right to present a defense. (Doc. 1, at 5.) In ground two, he contends that his trial counsel was ineffective for several reasons. (Doc. 1, at 9.)

Respondent contends the state court's resolution of Petitioner's claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law or an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. (Doc. 32.)

8

A. *Standard of Review*

This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320 (1997). Under AEDPA, a habeas petition will not be granted with respect to any claim adjudicated on the merits by the state court unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002). In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. *Id*. Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). The Court may also grant relief if the state court's decision was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the last reasoned state court decision and presumes it provides the

basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (*overruled on other grounds by Andrade*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim. *See Early*, 537 U.S. at 8. "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly established federal law. *Id.* Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Andrade*, 538 U.S. at 72.

B. *Analysis*

1. Ground One

Petitioner claims that the trial court denied his right to present a defense by failing to permit him to reopen his case and present additional medical records that purportedly contained some information about the temperature of Karina's body at the hospital. (Doc. 1.) On direct appeal, Petitioner claimed that the trial court erred by denying his motion that was made at the close of the evidence phase of trial to admit into evidence three medical documents containing references to Karina's body temperature at the hospital. (Lodgment 1, at 14; Lodgment 6, 19 RT 3763-65.) Respondent argues that the trial court's determination to exclude this evidence was made in accordance with Supreme Court law and was based on a reasonable determination of the facts in light of the evidence presented in the state court proceeding. (Doc. 32-1, at 18.)

Here, the trial judge noted that the defense attorney sought to admit into evidence documents that the defense wished to interpret differently than what the emergency room doctors and nurses claimed in their testimony on the stand. The defense attorney wished

10

15cv2756 JAH (PCL)

to contradict the record of Karina's temperature being recorded as hypothermic before her arrival at the hospital and before she was put on a "hypothermia protocol" in hopes to save her life. (Lodgment 6, 19 R.T. 3765-70.) The trial judge ruled that there was not a proper foundation laid to admit the three documents into evidence because the doctors and nurses who wrote the documents did not have an opportunity to discuss and justify the contents of the documents on the stand. (Lodgment 6, 19 R.T. 3765-70.) The trial judge excluded the medical notes because they were cumulative of other evidence in the record showing that she presented as hypothermic to the emergency room staff and because they were sought to be used to mislead and confuse the jury without a proper foundation for doing so. (Lodgment 6, 19 R.T. 3765-70.) The California Court of Appeal was right to reject Petitioner's claim that the trial court committed an error of constitutional dimension as the "application of ordinary rules of evidence like Evidence Code section 352 does not implicate the federal Constitution." (Lodgment 1, at 15-16.) *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (absent some federal constitutional violation, a violation of state evidentiary law does not ordinarily provide a basis for federal habeas relief.) Under the Constitution, states are afforded a "'broad latitude'" in establishing "'rules excluding evidence from criminal trials.'" *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (citation omitted). Evidentiary rules "do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *U.S. v. Scheffer*, 523 U.S. 303, 308 (1998) (citation omitted). The application of Evidence Rule 352 to the three documents that Petitioner claims would have helped his defense was not arbitrary and was reasonable given the lack of foundation for their admission into evidence at his trial. As the trial court properly exercised its discretion in excluding the documents from being admitted into evidence, Petitioner is not entitled to federal habeas corpus relief on this claim.

2. Ground Two

In Ground Two, Petitioner claims that he was denied his right to effective assistance of counsel and presents six sub-claims that his counsel failed to present

evidence, either by expert testimony or by cross-examination, which should have been presented at his trial. (Doc. 1, at 9-39.) Respondent argues that the California Supreme Court's determination that Petitioner's counsel was not ineffective was neither contrary to nor an objectively unreasonable application of clearly established federal law or an unreasonable determination of the facts. (Doc. 32, at 23.)

To establish ineffective assistance of counsel under federal law, Petitioner must prove: (1) counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 688, 694, 697 (1984). A reasonable probability of a different result "is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. The court may reject the claim upon finding either that counsel's performance was reasonable or the claimed error was not prejudicial. *Id.* at 697; *see also Rios v. Rocha*, 299 F.3d 796, 805 (9th Cir. 2002) ("Failure to satisfy either prong of the *Strickland* test obviates the need to consider the other.").

Review of counsel's performance is "highly deferential" and there is a "strong presumption" that counsel rendered adequate assistance and exercised reasonable professional judgment. *Williams v. Woodford*, 384 F.3d 567, 610 (9th Cir.2004) (quoting *Strickland*, 466 U.S. at 689). The court must judge the reasonableness of counsel's conduct "on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690. The court may "neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight ...." *Matylinsky v. Budge*, 577 F.3d 1083, 1091 (9th Cir.2009) (internal citation omitted). Petitioner bears the burden to "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotations omitted).

"Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both 'highly deferential.' *Id.* at 689; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997). When the two apply in tandem, review is 'doubly' deferential. *Knowles v. Mirzayance*,

556 U.S. 111, 123 (2009). The *Strickland* standard is a general one, so the range of reasonable applications is substantial. *Id.* Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).

> **a. *The state court's determination that counsel was not ineffective in failing to present additional evidence re: Karina's initial condition was not unreasonable.***

Petitioner contends that his counsel was ineffective for failing to present medical records accurately showing Karina's condition at the house and shortly after her arrival at the hospital with respect to her heart activity, her body temperature, and the condition of her pupils. (Doc. 1, at 11-21.) Firstly, Petitioner wishes to dispute the fact that Karina had no cardiac activity when the paramedics arrived and argues that his counsel was ineffective for not presenting evidence that showed that the cardiac machine "had a heart rhythm when the paramedics got there." (Doc. 46, at 10.) Petitioner contends that the machine mistakenly reported that her heart went into asystole as "30 seconds later [the machine] registers a heartbeat of 132 bpm . . . before any medications were given." (Doc. 46, at 10.) However, Petitioner doesn't acknowledge the fact that Karina was consistently receiving CPR during the time when the machine was monitoring her heart. It is not unreasonable to assume that the heartbeat reading of 132 was due to the fact that her heart was being manually pumped by paramedics. The totality of the evidence shows that Karina did not have a pulse for at least eight minutes until after her heart was repeatedly pumped and was electrically charged with medication. (See doc. 1, exhibit D, at 92-111.) Secondly, Petitioner claims that a few notations in the medical records show that Karina's body temperature was not low until after hospital staff initiated a protocol to reduce her temperature. (Doc. 1, at 15-19.) Petitioner wishes to argue that paramedics McQueen, Challender, and Olson, who "repeatedly testified that they observed that Karina's

temperature was 'colder than expected,'" should have been cross-examined by his trial attorney and confronted with their reports that Karina's temperature was in fact "normal." (Doc. 46-1, at 11-12.) Even giving Petitioner the benefit of the doubt that Karina's body temperature was not accurately measured by hospital staff upon her arrival at the hospital and her hypothermia was solely due to the hypothermia protocol administered to lower her core temperature to potentially benefit her brain, Karina still could have had a colder than normal skin temperature even while presenting with relatively "normal" internal body temperature. Thus, the state court was not unreasonable in concluding that failure to cross-examine the paramedics' testimony about Petitioner's skin temperature was not prejudicial to Petitioner. Thirdly, Petitioner argues that Karina's "fixed and dilated" pupillary condition was due to the medications she received and not evidence of the prosecution's "prolonged downtime" theory. Petitioner disputes the paramedics' testimony that Karina's pupils were fixed, dilated and unresponsive when first assessed by paramedics by pointing to a declaration of R.N./Paramedic Instructor Ron Lopez who reported that Karina's eyes initially had a normal response. (Doc. 46, at 16.) Again, a reasonable explanation for the differing testimony is that the condition of Karina's eyes could have changed following receiving CPR from paramedics. In any event, Petitioner's guilt did not depend upon the exact medical condition of Karina's eyes upon first encounter by paramedics. His guilt was proved by the physical evidence of strangulation, the bruised and battered condition of her body, and Petitioner's testimony and demeanor on the stand. Overall, the state court's implicit finding of no reasonable likelihood that Petitioner could have received a more favorable result was not objectively unreasonable.

**b. *The state court's determination that counsel was not ineffective in failing to object to the paramedics' testimony was not unreasonable.***

Petitioner acknowledges that "the decision of whether their testimony would have been admissible is a question of state law that is not reviewable by this Court." (Doc. 46-1, at 16.) Petitioner concedes that the state court decision on this sub-claim was a

reasoned decision and is entitled to deference under 28 U.S.C. § 2265(d). (Doc. 46-1, at 16-17.)

### c. The state court's determination that counsel was not ineffective in failing to present evidence that Karina had a spine injury was not objectively unreasonable.

Petitioner contends that defense counsel was constitutionally ineffective for failing to present evidence that Karina had a cervical spine injury. (Doc. 1, at 28-31.) More specifically, Petitioner contends that the defense attorney should have impeached the prosecution's pathologist, Dr. Mena, who dictated his initial autopsy report and at first noted that Karina had "cervical vertebra (C2-C4) [that] are very mobile and have hemorrhage on the right side, consistent with fracture." (Doc. 1, at 53.) However, Dr. Mena went on to note in his initial autopsy report that "[t]here's no hemorrhage around the cervical spinal cord [and] there's no subdural or epidural hemorrhage along the cervical spine." *Id.* Dr. Mena's final autopsy report did not include a cervical spine injury, and he went on to testify on the stand that he found no injury to her spine or cervical spine that was consistent with a fall. (Lodgment 6, 15 RT 2809-10, 14 RT 2167-69.) He concluded that the evidence on the whole indicated that Karina must have died of strangulation. (Lodgment 6, 14 RT 2179-2183.) Because Dr. Mena never dictated that Karina in fact had a cervical spine injury but merely stated on initial examination that she had hemorrhage on the right side of her spine, possibly "consistent with fracture," Dr. Mena, or defense counsel, could have reasonably counter-argued against this potential impeachment evidence. It was not unreasonable for the state court to conclude that defense counsel was not ineffective for failing to impeach Dr. Mena with an arguably twisted interpretation of Dr. Mena's own initial thoughts when he first examined Karina.

### d. The state court's determination that counsel was not ineffective for failing to present evidence about an alleged blood disorder was not unreasonable.

Petitioner contends that defense counsel was constitutionally ineffective for failing to present evidence that Karina had Disseminated Intravascular Coagulpathy (DIC). (Doc. 1, at 31-35.) The defense expert forensic pathologist testified that Karina's anemia,

15

15cv2756 JAH (PCL)

low platelet count and slow clotting contributed to her extensive bleeding and bruising, but he did not testify that she had DIC, a blood disorder that causes those conditions. (Doc. 1, at 32.) In his Petition, Petitioner has presented an expert who opines that Karina had DIC, caused by hypoxia. (Doc. 1, at 28-35.) The expert would have testified that once DIC has set in, a patient would bleed easily with minimal trauma. (Doc. 1, at 33-34.) However, this expert does not explain how Karina came to have hypoxia. In the trial record, the pathologist and the treating physician both testified that the external blunt force injuries to Karina's head were not severe enough to cause brain damage which led to her hypoxia. However, there is ample evidence in the trial record that the cause of Karina's brain hypoxia was strangulation. (Lodgment 1, at 8-10.) Even if this new expert testimony could have assisted the defendant in some way, competent counsel can reasonably choose not to use it based on all of the circumstances of the case. *See Harrison v. Richter*, 562 U.S. 86, 106-10 (2011). Because trial counsel was not ineffective in failing to present the DIC theory, this claim should be denied.

### e. Court's finding that counsel was not ineffective for not presenting evidence that Karina's bruise was caused by medical staff was not objectively unreasonable.

Petitioner contends that defense counsel was ineffective for failing to present evidence that the patterned bruise on Karina's leg might have been the result of medical treatment she received instead of being caused by a kick from Petitioner. (Doc. 1, at 35-37.) The prosecutor called an expert criminalist who opined that the bruise on Karina's leg looked like it was caused by footwear. (13 RT 1932-33.) However, shoes taken from Petitioner did not match the patterns on Karina's body. (13 RT 1935.) Defense counsel challenged this footwear theory by vigorous cross-examination. (13 RT 1940-69, 1972-73.) Under cross examination, the expert admitted that the bruise on Karina's leg could have been caused by anything, and he did not know for certain that it was caused by a shoe. (13 RT 1968.) Under these circumstances, defense counsel's failure to present an expert to counter the prosecution's expert was not deficient performance because "defense counsel represented him with vigor and conducted a skillful cross-examination.

16

As noted, defense counsel elicited concessions from the State's experts and was able to draw attention to the weaknesses in their conclusions." *Harrington v. Richter*, 562 U.S. 86, 111 (2011). As the state court's determination was in line with *Harrington*'s reasoning, this claim should be denied.

### *f. The state court's determination that counsel was not ineffective in failing to present a blood spatter expert was not objectively unreasonable.*

Finally, Petitioner contends that defense counsel was ineffective for failing to present a blood spatter expert to counter the testimony of the prosecutor's blood spatter expert. (Doc. 1, at 37-38.) However, "*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Harrington*, 562 U.S. at 111. It is enough for defense counsel to elicit "concessions from the State's expert and … draw attention to the weaknesses in their conclusions." *Id.* In this instance, defense counsel again vigorously cross-examined the State's blood spatter expert, eliciting from him acknowledgements that Petitioner could have caused Karina's movement while trying to revive her and all that any expert could conclude was that there was some movement of the body within the bloodstain pattern. (14 RT 2023-24, 2017.) As defense counsel was effective in his cross examination of the state's blood spatter expert, it was not necessary for him to bring in his own blood spatter expert. Thus, the state court's denial of this claim was not objectively unreasonable.

## IV. CONCLUSION

The Court submits this Report and Recommendation to United States District Judge John A. Houston under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.

**IT IS HEREBY RECOMMENDED** that the Court issue an order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **DENYING** the Petition for Writ of Habeas Corpus.

**IT IS ORDERED** that no later than December 29, 2017 any party to this action

15cv2756 JAH (PCL)

may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation." The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATE: December 8, 2017

Peter C. Lewis
United States Magistrate Judge